# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| POCONO MOUNTAIN SCHOOL DISTRICT, <br><br> Plaintiff, <br><br> v. <br><br> J.W., by and through his Parents, J.W. and S.W. and J.W. and S.W. in their own right, <br><br> Defendants. | NO. 3:16-CV-0381 <br><br> (JUDGE CAPUTO) |

## MEMORANDUM

Presently before me are a Motion for Judgment on the Administrative Record (Doc. 23) filed by the Pocono Mountain School District (the "District" or "Plaintiff") and a Motion for Judgment on the Administrative Record (Doc. 26) filed by J.W. ("Student"), by and through J.W. and S.W. ("Parents"), as well as Parents in their right own right (collectively, "Defendants"). The District commenced this action by filing the Complaint on March 2, 2016, which is in the nature of an appeal under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"), seeking reversal of a final administrative decision dated December 14, 2015 (the "Hearing Officer's Decision"), which found that the District denied Student a Free Appropriate Public Education ("FAPE") for his sixth and seventh grade years. Because the Hearing Officer's factual findings are supported by the administrative record and the educational program offered to Student was not reasonably calculated to allow him to make progress appropriate in light of his circumstances, the Hearing Officer's Decision will be affirmed, Defendants' Motion for Judgment on the Administrative Record will be granted, and the District's Motion for Judgment on the Administrative Record will be denied.

## I. Background

**A.    Factual Background.**

Student entered the District in kindergarten and continued in the District into junior high

school. (*See* HOD, ¶ 2).[1] Student has a documented medical history of developmental delays. (*See id*. at ¶ 1). Student has been diagnosed with pervasive developmental disorder, Asperger's Disorder, Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, Language Disorder, Developmental Coordination Disorder and Mood Disorder. (*See id*.). Student's educational history includes early intervention services, such as classroom based education and speech and language support, as well as emotional support services. (*See id*. at ¶ 3). Student's in-school behavioral background includes fifty-five (55) disciplinary referrals since he enrolled in the District in kindergarten. (*See* S-14, 2). Student received disciplinary referrals for reasons such as defiance, disrespectful behavior, physical alterations, inappropriate language, and possession of a weapon. (*See* HOD, ¶ 5).

In October 2012, while Student was in fifth grade, he was offered an Individualized Education Program ("IEP") placing him in Supplemental Education Support, with full-time inclusion in regular education classes. (*See id*. at ¶ 8; *see also* S-2, 28). The October 2012 IEP indicated referral to the Emotional Support Classroom when needed by Student or to address inappropriate behavior or conduct. (*See* HOD, ¶ 8; *see also* S-2, 48). Student was also to continue receiving speech and language support. (*See* S-2, 26). The October 2012 IEP also offered a behavior support plan addressing work refusal, frustration, and physical aggression. (*See id*. at 41-50). Academically, the October 2012 IEP identified Student's performance as below fourth grade average in mathematics and average in reading fluency and comprehension pursuant to criterion-based testing. (*See* HOD, ¶ 9). On the Pennsylvania System of School Assessment ("PSSA") for his fifth grade year, Student tested basic on math and writing and below basic in reading. (*See* S-7, 6).

Student began his sixth grade year, *i.e.*, the 2013-2014 school year, with the October 2012 IEP

---

[1] Documents and testimony are cited in the same manner in which they are identified in the administrative record. (*See* Docs. 5-7). Accordingly, "HOD" refers to the Hearing Officer's Decision; "P-" refers to the Parents' exhibits in the due process hearing; "S-" refers to the District's exhibits in the due process hearing; and "N.T." refers to the notes of testimony from the underlying due process hearing.

2

in place. (*See* N.T. 314:7-16).[2] During Student's sixth grade year, Student struggled with academic performance, organization, and homework/assignment completion. (*See* HOD, ¶ 16). Student frequently slept in class and his conduct interfered with the learning process, including acts of aggression, cursing and muttering under his breath, refusal to follow rules, and defiance. (*See id*.). Student's struggles and behavioral issues were known by the District from the outset of the 2013-2014 school year. (*See id*. at ¶ 18). To help Student with his performance that year, Parents retained a private tutor. (*See id*. at ¶ 19).

In October 2013, a new IEP was offered to Student for the remainder of his sixth grade year. (*See* S-4, *generally*). The October 2013 IEP documented Student's academic performance in mathematics as severely below fifth grade average, while his reading fluency and comprehension performance were both average. (*See id*. at 10-11). The October 2013 IEP offered measurable goals for mathematics, vocabulary, language processing skills, and English language syntax. (*See* HOD, ¶ 25). Additionally, modifications and specially designed instruction were provided to address, *inter alia*, Student's needs regarding organization, processing instructions, processing speed, homework completion, vocabulary, attention difficulties, and emotional regulation/classroom behavior. (*See id*.). The October 2013 IEP further provided a behavior support plan addressing work refusal, frustration, and physical aggression. (*See id*. at ¶ 26). The behavior plan also utilized a point plan which Student would earn points based upon teacher judgment and teacher assessment of Student's overall behavior during each class. (*See id*. at ¶¶ 27-28).

A reevaluation report of Student was prepared by the District in March 2014. (*See id*. at ¶ 30). The March 2014 reevaluation report included a review of Student's educational records as well as the administration of sub-tests of a standardized achievement test. (*See id*. at ¶ 31). The results of Student's reading scores in the March 2014 reevaluation report were mixed, including that Student was reading at a third grade level and that his scores were below basic, but Student scored above the benchmark for reading fluency in a standardized assessment for monitoring the emergence of early

---

[2] The issue before the Hearing Officer pursuant to a stipulation of the parties was the appropriateness of District services for Student's sixth and seventh grade years. (*See* HOD, 1 n.3).

3

literacy skills. (*See id.* at ¶ 32). In math, Student's benchmark testing was below basic, but his performance on the fifth grade PSSA in math was basic. (*See id.* at ¶ 33). Student's first and second quarter grades for the 2013-2014 school year were passing and at or above the "C" level. (*See id.* at ¶ 34). The report concluded that Student no longer had a speech/language impairment and should be dismissed from the speech/language support program. (*See id.* at ¶ 30). Student's primary disability category as identified in the March 2014 reevaluation report was Other Health Impairment. (*See* S-7, 13).

In April 2014, a new IEP was offered by the District. (*See* S-8, *generally*). The April 2014 IEP continued Student's placement in supplemental emotional support with all classes in regular education. (*See id.* at 22). The positive behavior support plan again noted Student's behaviors of concern, including work refusal, frustration, and physical aggression. (*See id.* at 27-28). Additionally, the April 2014 IEP identified falling asleep during class as a behavior of concern. (*See id.* at 28).

The April 2014 IEP remained in place at the beginning of Student's seventh grade year, the 2014-2015 school term. (*See* N.T. 339:4-23). A team IEP meeting was held in February 2015 at the request of S.W. because of concern about Student's behavior. (*See* HOD, ¶ 49). S.W. also requested a reevaluation of Student's IEP at that time to ensure it was meeting Student's academic needs. (*See* S-11, 1). S.W. further indicated that it was taking Student a "very long time" to complete his homework. (*See id.*). However, S.W. was reluctant to cut down her son's workload. (*See id.* at 1-2). Student's grades for the second quarter of his seventh grade year were poor, including 65% in social studies, math, and English language arts, and 70% in science. (*See id.* at 8). The main cause for the poor grades was identified as Student's lack of effort and completion of work. (*See id.*). At that time, it was determined that Student would be placed in learning support for his English language arts class and that a reevaluation of Student would be conducted which would include educational testing. (*See id.*). Additionally, the February 2015 IEP noted that Student's classroom behavior inhibited his ability to learn and that Student refused to complete work and would fall asleep in class. (*See id.* at 9). The IEP was also revised to permit Student to chew gum or have candy in class to reduce Student's use of inappropriate language when frustrated. (*See id.* at 21).

4

A Functional Behavioral Assessment ("FBA") of Student was prepared in May 2015. (*See* HOD, ¶ 55). The FBA noted Student's concerning behavior to include frustration and falling asleep in class. (*See id*.; *see also* S-13, 1).

A reevaluation report of Student was provided by the District on or about May 27, 2015. (*See* HOD, ¶ 56). The reevaluation report summarized Student's educational, behavioral, and medical history. (*See* S-14, 1-4). The May 2015 reevaluation report set forth Student's report card grades for the prior three years, as well as the first three quarters of his seventh grade year. (*See id*.). On the sixth grade PSSAs, the May 2015 reevaluation report noted that Student performed below basic in both reading and mathematics. (*See id*. at 8). The reevaluation report "recommended that the IEP team continue to find [Student] eligible for and in need of special education services as a student within an Other Health Impairment, due to his medical diagnoses and continued behavioral concerns with the school setting, which are adversely impacting upon his educational performance." (*Id*. at 31). The May 2015 reevaluation report further indicated that Student satisfied the eligibility requirements for the educational classification of Specific Learning Disability. (*Id*.). More particularly, the May 2015 report stated that Student "does not achieve adequately for a student his age in the areas of basic reading skills, reading comprehension, mathematics calculation, and mathematics problem-solving" based on standardized test performance, and the report provided that Student exhibits weaknesses in these areas relative to his intellectual development and same-aged peers. (*Id*. at 35; *see also* HOD, ¶ 62).

A revised IEP was offered by the District in June 2015. (*See* HOD, ¶ 68). The June 2015 IEP included a modification of work in Student's core academic classes according to his reading and writing ability. (*See* S-15, 29). Itinerant emotional support was provided for in the June 2015 IEP. (*See id*. at ¶ 69). The June 2015 IEP also provided a positive behavioral support plan to address inappropriate language and in-class sleeping. (*See id*. at ¶ 73). Student, however, was ineligible for Extended School Year ("ESY") following the 2014-2015 school year because Student "continue[d] to make progress on his IEP goals. [Student] does not demonstrate difficulties recouping previously learned information and/or skills upon return of an extended interruption of curricular instruction. In addition, he also demonstrates the ability to maintain curricular instruction and content." (S-15,

32-33).

On August 26, 2015, the District revised Student's IEP to change Student's school to the catchment area school. (*See id*. at ¶ 74). Further, Student was placed in a supplemental emotional support classroom for mathematics, English language arts, science, and social studies. (*See id*.).

**B. Procedural History.**

Based on the foregoing, Parents filed a due process complaint on or about July 14, 2015 requesting a hearing pursuant to the IDEA. (*See* Doc. 7-2, *generally*). Specifically, Parents alleged that the District denied Student a FAPE as a result of the District's failure to provide adequate behavioral and academic support and Student's failure to make meaningful educational progress. (*See id*. at ¶ 6). As relief, Parents requested that the District develop an appropriate educational placement for Student, as well as an award of compensatory education for the 2013-2014 and 2014-2015 school years, *i.e.*, Student's sixth and seventh grade years. (*See id*).

The Hearing Officer conducted evidentiary hearings on October 28, 2015 and November 2, 2015. (*See* N.T., *generally*). By decision dated December 14, 2015, the Hearing Officer granted in part the relief requested by the family. (*See* HOD, *generally*). More particularly, the Hearing Officer awarded compensatory education to Student in the amount of six (6) hours per day for every school day attended by Student from the first day of school in the 2013-2014 school year until and including February 28, 2015 and in the amount of two (2) hours per day for every school day attended by Student from March 1, 2015 until the last day of the 2014-2015 school year. (*See id*. at 21-22). The Hearing Officer, however, denied all other requests for relief, including Parents' claim for ESY for the summer of 2015. (*See id*. at 19).

In finding in favor of Student and Parents , the Hearing Officer explained:

[T]he District failed to provide Student with educational services that were reasonably calculated to provide Student with an opportunity for meaningful educational gain, based upon the District's state of knowledge at the beginning of Student's sixth grade and throughout Student's sixth and seventh grades. The District failed to identify Student with a specific learning disability in reading, writing and mathematics, despite its knowledge of Student's severely below-grade academic performance in previous testing. It failed to provide the intensity of supports that would have been reasonably calculated to address these needs appropriately. It failed to address appropriately Student's serious organization and behavioral struggles during this time, despite its longstanding knowledge of Student's needs in these areas. Taken together, theses failures rose to the level of a failure to provide Student with a FAPE.

(*Id*. at 13). Additionally, the Hearing Officer found that the District inappropriately failed to identify Student's specific learning disability prior to his sixth grade year. (*See id*.). The Hearing Officer observed that the reevaluation reports of Student conducted by the District in 2011 and 2014 were not comprehensive enough to discover what was eventually found - Student had been struggling for years with specific learning disabilities. (*See id*. at 14). As a result, the District failed to offer Student appropriate special education placements for sixth and seventh grade. (*See id*.).

The Hearing Officer commented that the evidence, when taken as a whole, was "preponderant that Student failed to progress academically at more than a snail's pace," and that although Student's progress was "incremental", it was "so slow that there was no reasonable basis to think that Student could reach IEP goals established for accomplishment within a yearly IEP terms." (*Id*. at 15). The Hearing Officer also considered the evidence cited by the District as support that Student made meaningful academic progress, but he determined that when weighed against evidence that Student did not make meaningful progress, such as criterion referenced testing reported in 2014, incremental progress on IEP goals in seventh grade, and below basic PSSA scores, the evidence preponderated in favor of Parents' claims. (*See id*.). Most significant to the Hearing Officer was the May 2015 reevaluation report which was "palpably more comprehensive" that the 2014 reevaluation report and raised the inference that Student struggled with specific learning disability throughout the years at issue. (*See id*. at 15-16). In contrast, the Hearing Officer accorded the 2014 achievement scores less weight because they were not administered by the school psychologist, were inconsistent with several other indicators, and there was no apparent effort to reconcile these inconsistencies. (*See id*. at 16). Further, the Hearing Officer noted that the utility of Student's grades was reduced because they were influenced by various factors, such as re-testing when grades fell below a certain point and extended time. (*See id*. at 16-17). The Hearing Officer also found teacher reports to be of less import because they were facially self-contradictory, were purely subjective, failed to employ reliable data collection methods for Student's sixth grade years, and were in conflict with J.W.'s reports of Student's struggles with homework and academics generally. (*See id*. at 17).

With respect to Student's behaviors during the relevant period, the Hearing Officer determined that the evidence was preponderant that the District's plan failed to appropriately address Student's

7

aggressive behaviors, mumbling and cursing, and work refusal in sixth and seventh grade. (*See id*.). The Hearing Officer noted that sleeping in class was an additional work avoidance behavior displayed by Student and documented by the District in April 2014 but was not the focus of a functional behavioral assessment until May 2015. (*See id*.). Regarding teacher reports of Student's improved behaviors in sixth grade, the Hearing Officer found they were not preponderant for improved behavior as there was not a reliable data-gathering system to substantiate these reports and recording of this information was haphazard. (*See id*. at 18). The Hearing Officer likewise determined that the evidence was preponderant that Student's work avoidance behaviors and defiance continued into calendar year 2015, with evidence of meaningful progress only beginning in March 2015. (*See id*.).

In reaching his decision, the Hearing Officer found all witnesses credible, but he assigned lower reliability to the testimony regarding Student's progress in sixth grade because such progress was not documented through reliable data. (*See id*. at 20).

Ultimately, the Hearing Officer awarded compensatory education. (*See id*. at 20-21). In so doing, the Hearing Officer explained that Student from the beginning of his sixth grade year until March of his seventh grade year was deprived of the District's educational services, as he made only "*de minimis* academic progress" and because Student's "emotional state and behavioral and social behaviors rendered school a painful burden to Student, with little or no gain in these non-academic realms." (*Id*. at 20). Thus, full days of compensatory education were awarded for that period. (*See id*.). However, because Student showed some progress and benefit from school after March 1, 2015 through the end of Student's seventh grade year but he nevertheless continued to fall behind his grade and age-level peers in basic skills of reading, writing, and mathematics even during this period, the Hearing Officer concluded that Student was entitled to two (2) hours per day of compensatory education for that time. (*See id*. at 20-21).

The District timely appealed the decision of the Hearing Officer by filing the Complaint with this Court on March 2, 2016 seeking reversal of the Hearing Officer's December 14, 2015 decision and award. (*See* Doc. 1). Defendants filed their Answer and Counterclaim on April 15, 2016 requesting that the Hearing Officer's decision be affirmed in its entirety and that Defendants be reimbursed for all costs including attorney's fees. (*See* Doc. 8).

The District thereafter filed a Motion to Supplement the Administrative Record, (*see* Doc. 13), which was denied on November 14, 2016. (*See* Docs. 18-19). Plaintiff then filed a Motion for Judgment on the Administrative Record and supporting brief on January 12, 2017. (*See* Docs. 23-24). Defendants also filed a Motion for Judgment on the Administrative Record the same day. (*See* Docs. 26-27). The cross-motions for judgment on the administrative record are now fully briefed and ripe for disposition.

## II. Discussion

### A. Legal Standard.

A district court has jurisdiction to review the decision of the state educational agency under the IDEA. *See* 20 U.S.C. § 1415(i)(2)(A); *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3rd Cir. 2012). The party challenging the administrative decision in the district court bears the burden of persuasion. *See id*. at 270; *see also Sch. Dist. of Pittsburgh v. C.M.C.*, No. 16-092, 2016 WL 4273175, at *5 (W.D. Pa. Aug. 12, 2016) ("The burden of proof rests with the party seeking relief, in this case the School District.").

"When considering a petition for review challenging a state administrative decision under the IDEA, a district court 'applies a nontraditional standard of review, sometimes referred to as a modified *de novo* review.'" *Ridley*, 680 F.3d at 268 (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010)). A district court must give "due weight" to the finding of the hearing officer under this standard. *See id*. (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)). "Factual findings from the administrative proceedings are to be considered *prima facie* correct. 'If a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities.'" *Id*. (quoting *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)); *see also D.S.*, 602 F.3d at 564 ("The 'due weight' obligation prevents district courts from imposing their own view of preferable education methods on the states."). Further, when a hearing officer "has heard live testimony and determined that one witness is more credible than another witness, [the hearing officer's] determination is due special weight." *Id*. A district court "must accept the [hearing officer's] credibility determinations 'unless the non-testimonial, extrinsic evidence in the

record would *justify* a contrary conclusion.'" *Id*. (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199(3d Cir. 2004)) (emphasis in original). A district court, however, is not bound by the hearing officer's conclusions of law, and the application of legal standards at the administrative hearing are subject to *de novo* review. *See In re Educational Assignment of Joseph R.*, 318 F. App'x 113, 118 (3d Cir. 2009) ("In contrast, the 'due weight' to be afforded to the administrative proceedings is 'not implicated with respect to issues of law, such as the proper interpretation of the IDEA and its requirements'; that is, the district court owes no deference to conclusions of law drawn by a state or local educational agency." (alteration omitted)).

**B.     Statutory Framework.**

The IDEA requires that states receiving federal education funding provide all disabled children with a FAPE. 20 U.S.C. § 1412(a)(1). The statute seeks "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). "Although a state is not required to maximize the potential of every handicapped child, it must supply an education that provides 'significant learning' and 'meaningful benefit' to the child." *Ridley*, 680 F.3d at 269 (quoting *D.S.*, 602 F.3d at 556). The provision of a "trivial educational benefit" does not suffice. *Id*.

The core of the IDEA is the "collaborative process that it establishes between parents and schools," and the IEP is the "central vehicle for this collaboration." *Id*. (citations and quotation omitted). The IEP, which must be tailored to the student's unique needs, *Anello v. Indian River Sch. Dist.*, 355 F. App'x 594, 598 (3d Cir. 2009), includes, *inter alia*, a statement of the child's present levels of academic achievement and functional performance; a statement of measurable annual goals, including academic and functional goals; and a statement of how the child's progress toward the annual goals will be measured. *See* 20 U.S.C. § 1414(d)(1)(A)(i). The purpose of the IEP is to establish a plan for the academic and functional advancement of the child in light of that child's particular circumstances. *See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, --- U.S. ---, 137 S. Ct. 988, 999, 197 L. Ed. 2d 335 (2017). However, "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date. . . .

Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." *Carlisle Area Sch. v. Scott P. By and Through Bess P.*, 62 F.3d 520, 534 (3d Cir. 1995).

Earlier this year, the United States Supreme Court addressed the appropriate standard for determining whether a child receives sufficient educational benefits to satisfy the IDEA. *See Endrew F*, 137 S. Ct. at 993. In *Endrew F.*, the Supreme Court rejected the view that the IDEA requires only the provision of an educational benefit that is "merely more than *de minimis*." *Id*. at 1001. The *Endrew F.* Court explained that a "student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all." *Id*. Thus, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id*. at 999. Although the *Endrew F.* Court declined to "elaborate on what 'appropriate' progress [would] look like from case to case," the Court made certain that the "absence of a bright-line rule . . . should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id*. at 1001 (quoting *Rowley*, 548 U.S. at 206, 102 S. Ct. 3034).

## C. The District's Challenges to the Hearing Officer's Decision.

Because the District seeks relief from the Hearing Officer's Decision here, it bears the burden of persuasion. *See Ridley*, 680 F.3d at 270. The District argues that reversal of the Hearing Officer's Decision is compelled for four reasons. (*See* Doc. 24, 4-13). First, the District contends that the Hearing Officer's finding that Student was denied a FAPE in behavioral needs is not supported by the record and contrary to the Hearing Officer's factual findings. (*See id*. at 6-9). Second, the District challenges the Hearing Officer's conclusion that it failed to timely identify Student's specific learning disability. (*See id*. at 9-10). Third, the District disputes the Hearing Officer's determination that Student was denied a FAPE in the area of academics. (*See id*. at 10-11). And, fourth, the District argues that the Hearing Officer erred in the manner and amount of compensatory education that he awarded to Student. (*See id*. at 11-13).

11

### 1. Student's Behavioral Needs.

In finding in favor of Defendants, the Hearing Officer concluded that the District failed to appropriately address Student's behavioral struggles and that Student made "little or no gain" in this area. (*See* HOD, 13, 20). The District challenges this conclusion, arguing that the Hearing Officer's own findings and the administrative record undercut the determination that Student experienced no improvements in behavior. (*See* Doc. 24, 7-9).

The Hearing Officer's factual finding that Student made little if any gain in behavior is supported by the record evidence. More particularly, while the Hearing Officer noted that Student's defiant and disruptive behavior continued at "reduced levels" in sixth grade, he made clear that Student's work refusal and work avoidance behaviors "continued to interfere substantially with Student's access to the curriculum." (HOD, ¶ 45). Student also added a new classroom behavior in sixth grade - sleeping - that was identified by the District in April 2014, but this behavior was not "effectively" addressed until the end of Student's seventh grade year. (*See id*. at ¶ 41 and 17-18). The Hearing Officer further explained that although two teachers reported improved behavior by Student in seventh grade, one teacher indicated an increase in inappropriate language. (*See id*. at ¶ 52). Additionally, the February 2015 IEP attributed Student's poor grades and performance difficulties on his classroom behaviors, including work refusal and sleeping, which required significant prompting. (*Id*.). The administrative records supports these findings.

Further, the Hearing Officer's factual findings do not undercut his conclusions or the award of compensatory education. The Hearing Officer found that although Student's defiant behaviors may have improved during his sixth and seventh years, the evidence was preponderant that those behaviors continued for both years and impeded Student's learning. (*See id*. at 17-18). Moreover, the Hearing Officer concluded that when considered with his work refusal behaviors, including sleeping in class as the prominent form of work avoidance (and which was documented by the District during Student's sixth grade year), Student made little to no behavioral gains during his sixth and seventh grade years. (*See id*. at 17-20).

Considering the testimony and documents presented at the due process hearing, the District failed to offer Student an educational program reasonably calculated to allow him to make behavioral

12

progress in light of his circumstances. *See Endrew F.*, 137 S. Ct. at 1001. Significantly, the District knew that Student's serious behavioral issues were impeding his education, the various IEPs inadequately addressed and/or did not address these behaviors, and these behavioral problems were not managed through a consistent plan. *See Lauren P. ex rel David and Annmarie P. v. Wissahickon Sch. Dist.*, 310 F. App'x 552, 554 (3d Cir. 2009). Student was, therefore, denied a FAPE based on the District's failure to "address these behavioral problems in a systematic and consistent way . . . ." *Id.*; *accord New Milford Bd. of Educ. v. C.R.*, 431 F. App'x 157, 160 (3d Cir. 2011) ("If a mentally disabled child continuously presents an adverse behavior that genuinely interferes with his ability to garner any real benefit from the education provided and the IEP does not adequately remedy this behavior, it stands to reason that the school district has failed to provide even a 'basic floor of opportunity,' much less the meaningful benefit required by our Court."); *Aaron P. v. Haw. Dep't of Educ.*, 897 F. Supp. 2d 1004, 1022 (D. Haw. 2012) ("an IEP that fails to appropriately address such behaviors is not reasonably calculated to provide meaningful educational benefit."). Furthermore, "the sufficiency of chosen strategies for dealing with problematic behavior is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Sean C. through Helen C. v. Oxford Area Sch. Dist.*, No. 16-5286, 2017 WL 3485880, at *11 (E.D. Pa. Aug. 14, 2017). Mindful that I am not to substitute my own notion of sound educational policy for those of the local school authority and noting that the District bears the burden of persuasion here, the Hearing Officer's determination that the District's treatment of Student's behavioral problems during his sixth and seventh grade years deprived Student of a FAPE will be affirmed. *Accord D.S.*, 602 F.3d at 568 ("If we give as we should "due weight" to the ALJ's determination that D.S.'s ninth grade IEP was not reasonably calculated to enable D.S. to receive a meaningful educational benefit, we find no basis in the record for overturning that determination.").

### 2. Identification of Student's Specific Learning Disability.

The District next contests the Hearing Officer's finding that the District improperly failed to identify Student's specific learning disability prior to sixth grade. (*See* Doc. 24, 9-10). According to the District, the Hearing Officer reached this conclusion by ignoring record evidence and by engaging in impermissible speculation unsupported by the factual record. (*See id.*).

The Hearing Officer did not ignore record evidence as claimed by the District in finding that Student's specific learning disability was not timely identified. The Hearing Officer noted that the 2011 and 2014 reevaluation reports that formed the basis of the District's placement and programmatic decisions were not comprehensive enough to discover what was ultimately found - Student suffered for years with a specific learning disability. (*See* HOD Decision, 14). Independent review of the 2015 reevaluation report confirms the Hearing Officer's finding: it was "palpably more comprehensive than the 2014 reevaluation." (*Compare* S-14, *generally*, *with* S-7, *generally*).[3]

Moreover, the Hearing Officer's Decision was not based on impermissible speculation. Based upon the findings in the 2015 reevaluation report identifying Student as having a specific learning disability and observing that such designation was consistent with Student's academic and behavioral difficulties known to the District prior to Student's sixth grade year, the Hearing Officer inferred that Student had suffered with a specific learning disability through sixth and seventh grade. (*See* HOD, 16). This inference by the Hearing Officer was permissible, as it was a reasoned determination based on the record evidence. *Accord Caines v. City of New York*, 649 F. App'x 74, 77 (2d Cir. 2016) ("[a]n inference is not a suspicion or a guess but rather is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist").

Lastly, the Hearing Officer did not engage in "Monday Morning Quarterbacking" by relying on the May 2015 reevaluation report to infer that Student suffered with a specific learning disability during his sixth and seventh grade years. The Hearing Officer, in view of his factual findings and the record as a whole, found that the District, "despite its knowledge of Student's severely below-grade academic performance in previous testing" and its "longstanding knowledge of Student's

---

[3] The District contends that the Hearing Officer compared Student's results from two different versions of the Woodcock-Johnson test which were administered to him in successive years. (*See* Doc. 24, 9-10). The Hearing Officer, though, did not compare the results of these tests. (*See* HOD, 15-16). Rather, after discussing both the 2014 and 2015 reevaluation reports, the Hearing Officer found the May 2015 reevaluation report most convincing. (*See id*). The Hearing Officer so concluded without discussion or comparison of the results of the two Woodcock-Johnson tests.

14

organizational and behavioral struggles," nevertheless failed to identify Student's specific learning disability. (HOD, 13). Although this information was set forth in a May 2015 report, the information contained therein was all within the District's knowledge long before that and in advance of the start of the 2013-2014 school year. Thus, the Hearing Officer did not base his decision on after-acquired evidence. (*See id*.). The Hearing Officer's determination that the District failed to timely identify Student's specific learning disability will not be reversed.

### 3. Student's Academic Needs.

The District next contends that the Hearing Officer erred in finding that Student was denied a FAPE in the area of academics. *(S*ee Doc. 24, 10-11). The District argues that Student clearly progressed academically based on his passing grades and his performance on grade-normed programs. (*See id*. at 11). According to the District, the Hearing Officer ignored this academic progress, (*see id*.), and inappropriately focused on the results achieved (or lack of progress). (*See* Doc. 29, 2-3).

As stated, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S.Ct. at 999. The aim of the IEP is to enable a student to make progress because "the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *Id*. A substantive standard not targeted to student progress "would do little to remedy the pervasive and tragic academic stagnation" that prompted the passage of the IDEA. *Id*. Thus, a Court may consider a student's "academic progress in evaluating the appropriateness of the IEP for 'evidence of a student's later educational progress may [ ] be considered in determining whether the original IEP was reasonably calculated to afford some educational benefit.'" *D.S.*, 602 F.3d at 567 (alteration in original) (quoting *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993)) . Nevertheless, the Third Circuit has recognized that a child's progress must be measured in light of that individual child's potential. *See Ridgewood Bd. of Educ.*, 172 F.3d at 247 (citing *Rowley*, 458 U.S. at 202, 102 S. Ct. 3034).

The Hearing Officer's findings regarding Student's academic development will not be disturbed. Importantly, the Hearing Officer weighed the evidence of academic progress, stressing that the evidence was mixed. (*See* HOD, 15). Contrary to the claims of the District, the Hearing Officer

did not ignore evidence in reaching his conclusion. (*See* Doc. 29, 11). Rather, after an exhaustive review of the record, the Hearing Officer found that the evidence preponderated in favor of Student. (*See* HOD, 15).

The Hearing Officer's determinations are supported by the factual record. Significantly, the factual record is preponderant that Student "failed to progress academically at more than a snail's pace." (HOD, 15). In fact, Student's progress was so incremental there was no reasonable basis to believe that Student could reach or accomplish IEP goals within a yearly term. (*Id*.). Student's bench-mark scores well below grade expectations and the incremental progress reports on IEP goals further support the finding that Student was not receiving a meaningful education, was not making satisfactory progress, and was in fact falling beyond his age and grade peers. (*See id*. at 16). The District's own records confirm that Student, from a young age, struggled with a variety of basic academic skills, including special educational history, developmental delays, and speech and language disorder, yet, the District did not conduct a serious inquiry into Student's cognitive functioning until the end of his seventh grade year. (*See* S-14, *generally*). Thus, the educational program offered to Student during his sixth and seventh grade years was not reasonably calculated to allow Student to make appropriate progress under the circumstances. *See Endrew F.*, 137 S. Ct. at 1001. At best, the District offered Student an educational program promising *de minimis* academic progress. As such a program is insufficient, there is no basis for overturning the Hearing Officer's Decision. *See D.S.*, 602 F.3d at 568.

   **4.   Compensatory Education.**

Lastly, the District challenges the manner in which the Hearing Officer awarded compensatory education. (*See* Doc. 24, 11-13).[4] Citing the Hearing Officer's statement that "Student's emotional state and behavioral and social behaviors rendered school a painful burden to Student," the District contends that the Hearing Officer impermissibly awarded compensatory education for pain and

---

[4] The District also contends that the record does not support a finding that Student was denied a FAPE for his sixth and seventh grade years. (*See* Doc. 24, 12). For reasons articulated in greater detail in the text, Student was denied a FAPE for the 2013-2014 and 2014-2015 school years.

16

suffering. (*Id*. at 12-13).

"'A disabled student's right to compensatory education accrues when the school knows or should know that the student is receiving an inappropriate education.'" *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 739 (3d Cir. 2009) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007)). "When a school fails to correct a situation in which a disabled student 'is not receiving more than a *de minimis* educational benefit,' the "child is entitled to compensatory education for a period equal to the period of deprivation, excluding only the time reasonably required for the school district to rectify the problem." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (quoting *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 391-92 (3d Cir. 1996)). While compensatory education is a form of relief available under the IDEA, compensatory and punitive damages are not. *See Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 184-86 (3d Cir. 2009).

The Hearing Officer's award of compensatory education will be affirmed. Here, as explained previously, Student was provided an educational program offering, at most, *de minimis* academic and behavioral progress from year to year. Such a program does not satisfy the IDEA. *See Endrew F.*, 137 S. Ct. at 1001.

The amount of compensatory education awarded by the Hearing Officer was also appropriate. In particular, the administrative record supports the conclusion that whereas Student was denied the full benefit of the District's educational services from the beginning of his sixth grade year to the end of February of his seventh grade year, Student was able to derive some meaningful benefit in regards to behavioral and social development from the District's services from March 2015 to the end of his seventh grade year. (*See* HOD, 20-21). The Hearing Officer's factual findings are supported by the record, and the amount of compensatory education awarded by the Hearing Officer adequately compensates Student for his failure to receive a FAPE for his sixth and seventh grade years.[5]

---

[5] The Hearing Officer, as noted by the District, did state in his decision without citation to the record that Student's emotional and behavioral state rendered school a painful burden. (*See* HOD, 20). Despite this statement, I do not find that the Hearing Officer improperly awarded compensatory education to Student on

### III. Conclusion

For the above stated reasons, the Hearing Officer's Decision will be affirmed. As such, Defendants' Motion for Judgment on the Administrative Record will be granted and Plaintiff's Motion for Judgment on the Administrative Record will be denied.

An appropriate order follows.

September 8, 2017  /s/ A. Richard Caputo
Date  A. Richard Caputo
  United States District Judge

---

the basis of any purported pain or suffering. Rather, the Hearing Officer concluded that compensatory education was appropriate in the matter *sub judice* based on the District's failure to provide Student a FAPE for his sixth and seventh grade years. These findings are all supported by the administrative record. Thus, compensatory education in the amount awarded by the Hearing Officer was proper.